CLERKS OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED
August 24, 2026
LAURA A. AUSTIN, CLERK
BY: s/ D. AUDIA
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| Peewee Carmelo Martinez, | ) | Case No. 3:26-cr-00001 |
| | ) | |
| Defendant. | ) | |

# MEMORANDUM OPINION

This matter is before the court on Defendant Peewee Carmelo Martinez's Motion to Suppress. (Def.'s Mot. to Suppress (Dkt. 38).) Martinez argues that evidence gained from two residential searches must be suppressed for lack of probable cause. Martinez also contends that the search warrant affidavits contained false and misleading statements, entitling him to a *Franks* hearing. For the following reasons, the court will deny the motion.

## I. Background

### A. Factual History[1]

On October 24, 2025, Albemarle County Police responded to a report of a domestic dispute at 2215 Commonwealth Drive, an apartment complex in Charlottesville, Virginia. (Def.'s Mot. to Suppress at 2.) There, officers talked to Defendant Peewee Carmelo Martinez and Sikara Powell, the mother of Martinez's child. (*Id.*) Martinez and Powell reported to the officers that there were no problems between them, and police saw no indications of injury or a physical altercation. (*Id.*) The police left the scene shortly thereafter. (*Id.*)

[1] The following facts are drawn from the parties' briefs and exhibits, (Dkts. 38, 48, 51), as well as the arguments and evidence presented during the suppression hearing, (*see* Dkt. 52).

About eleven minutes later, Albemarle County Police returned to 2215 Commonwealth Drive after receiving a report of shots fired. (*Id.*) At the parking lot of the scene, officers encountered fourteen cartridge casings on the ground. (*Id.*) The casings were of two different calibers: .40 caliber and 9mm caliber. (Gov't's Resp. at 2 (Dkt. 48); 2331 Girtha Ln. Aff. at 5 (Dkt. 38-2 at 5–11).) A grey 2011 Nissan Maxima, registered to Defendant, was parked amid the casings. (Def.'s Mot. to Suppress at 2–3.) One of its windows had been shattered, seemingly by a bullet. (*Id.* at 3.) The car was towed to a police evidence lot. (*Id.*) No firearms were recovered at the scene, and Martinez was not present. (*Id.*)

Officer Cory Legg, one of the responding officers, conducted several interviews on the scene, as captured on his body-worn camera. (*Id.*) Witnesses identified a black male with dark skin, wearing grey sweatpants and a grey hoodie, as one of the two shooters. (Dkt. 38-3 at 10:15–10:36; 12:00–12:17; 31:15–34:18.) Two of the witnesses interviewed were Corneesha Cowan and her ten-year-old daughter, A.P. (Def.'s Mot. to Suppress at 3.) Cowan told law enforcement that she and A.P. were outside the apartment complex when two men in the parking lot started arguing, pulled out guns, and fired shots. (*Id.*; Dkt. 38-3 at 3:59–5:18.) She and her daughter rushed inside. (Def.'s Mot. to Suppress at 3.) Cowan could not identify either of the shooters. (*Id.*) Shortly after this report, Cowan stated that the men were arguing when she got to the apartment complex, and that she rushed to the apartment with her daughter. (*Id.*) By the time they reached the top of the stairs, according to Cowan, shooting began. (*Id.*; Dkt. 38-3 at 5:38–6:20.) A.P. did not mention that she knew either shooter. (Def.'s Mot. to Suppress at 3.) Officers detained K.C., Cowan's teenage nephew, as a suspect

in the shooting. (*Id.* at 4.) Cowan and A.P. saw that K.C. had been detained. (*Id.* at 4; Dkt. 38-3 at 26:15–27:21.)

Approximately an hour after officers arrived, Officer Legg interviewed Cowan and A.P. again. (Def.'s Mot. to Suppress at 4.) Officer Legg asked Cowan if Martinez was involved in the shooting, as law enforcement had responded to the apartment earlier that day for a possible domestic incident involving him. (*Id.*) Cowan responded that she did not know, but that she hated Martinez. (*Id.*; Dkt. 38-4 at 4:20–4:33.) A.P., who was also interviewed by the officer, said that she did not clearly see the shooters and that she could not identify either person. (Def.'s Mot. to Suppress at 4; Dkt. 38-4 at 6:44–7:00.) Officer Legg again asked A.P. if she had identified either shooter. (Def.'s Mot. to Suppress at 4.) A.P. initially responded no, but after making eye contact with her mother—who smiled and nodded—A.P. said that she recognized one of the shooters as "my auntie's baby daddy," which ostensibly meant Martinez. (*Id.*; Dkt. 38-4 at 7:59–8:51.) A.P. did not say "baby daddy" until Cowan mouthed the words "baby daddy" to her. (Dkt. 38-4 at 8:48.)

On October 28, 2025, Detective Nicholas Richardson obtained a GPS search warrant for Martinez's Nissan Maxima parked in the evidence parking lot. (Def.'s Mot. to Suppress at 5.) Martinez picked up the car from police custody on October 29, 2025, and drove it to his registered address, 2331 Girtha Lane. (*Id.*) Martinez was driven to the evidence storage lot by Miyanna Harris, Martinez's alleged romantic partner, who resides at 2037 Commonwealth Drive. (*Id.*; Gov't's Resp. at 3, 7.) On the evening of October 29, Detective Andrew Holmes observed a car registered to Harris and another car registered to Martinez, a white Nissan

Altima, parked at Harris's home. (Def.'s Mot. to Suppress at 6; 2037 Commonwealth Dr. Aff. ¶ 13 (Dkt. 38-1 at 5–15).) Around 10:00 p.m., with both cars parked outside, the first-floor lights were on inside the house. (Gov't's Resp. at 8.) Later that night—with both cars still parked outside—the lights in the home had been turned off. (*Id.*) Martinez's car was not there the next morning. (Def.'s Mot. to Suppress at 5.)

On October 31, 2025, Detective Holmes pursued a search warrant for 2037 Commonwealth Drive. (*Id.*; Dkt. 38-1.) The search warrant sought evidence of the offense of possession of a firearm by a convicted felon, in violation of Virginia Code Section 18.2-308.2. (Dkt. 38-1 at 1.) The warrant authorized a search for firearms, ammunition, mobile communication devices and their contents related to the offense, and "items of dominion and control of the residence" and vehicles associated with 2037 Commonwealth Drive. (*Id.*)

The material facts outlined in the affidavit to establish probable cause to search 2037 Commonwealth Drive were:

1. A shooting occurred at 2215 Commonwealth Drive on October 24, 2025. (2037 Commonwealth Dr. Aff. ¶ 1 (Dkt. 38-1 at 5–15).)
2. A Nissan Maxima registered to Martinez was parked in the parking lot amid fourteen spent cartridge casings. (*Id.*)
3. A witness saw a black male duck behind the car and shoot at someone with a silver handgun. (*Id.* ¶ 2.)
4. A.P. saw Martinez shooting from behind the Nissan Maxima. (*Id.* ¶ 3.)
5. A record search showed that Martinez has a registered address of 2331 Girtha Lane in Charlottesville, Virginia. (*Id.* ¶ 4.)
6. Detective Holmes had spoken with Martinez on previous occasions and knew him to be a black male known as "Melo" who is a convicted felon on active probation. (*Id.* ¶ 6.)

7. Detective Holmes was advised by a parole employee that Martinez's listed address is 2331 Girtha Lane in Charlottesville, that he has a cellular phone number in the parole record system, and that the parole employee last spoke to him at that number on September 3, 2025. (*Id.* ¶ 7.)

8. Detective Richardson spoke to Martinez on that number on October 28, 2025. (*Id.* ¶ 8.)

9. On October 29, 2025, Martinez was driven to the police evidence storage lot to pick up his grey Nissan Maxima in a car registered to Miyanna Harris, who lives at 2037 Commonwealth Drive. (*Id.* ¶ 10.)

10. Martinez drove the grey Nissan Maxima to 2331 Girtha Lane and parked it at 4:10 p.m. on October 29, 2025. (*Id.* ¶¶ 5, 11.)

11. Another car registered to Martinez was seen parked near 2037 Commonwealth Drive on the evening of October 29. (*Id.* ¶¶ 13, 15.)

12. Detective Holmes knows from experience that Martinez and other individuals take their firearms with them when they leave their residence or places they stay and carry them on their person for protection. (*Id.* ¶ 18.)

The search warrant affidavit requesting a search of 2331 Girtha Lane was similar but omitted facts about Martinez's alleged connections to 2037 Commonwealth Drive, as outlined in paragraphs 8–12 above.[2] (2331 Girtha Ln. Aff.) Neither affidavit in support of either search warrant mentioned A.P.'s age, her initial lack of identification of the shooters, the detention of K.C., or the interaction with her mother. (*See generally id.*; 2037 Commonwealth Dr. Aff.)

Law enforcement executed both search warrants on November 4, 2025. (Def.'s Mot. to Suppress at 7.) At 2037 Commonwealth Drive, police seized two cell phones, a .40 caliber Glock 27, three magazines, and 28 rounds of ammunition. (*Id.*) At 2331 Girtha Lane, police seized an iPhone, two empty Glock boxes, and seven rounds of ammunition. (*Id.*)

[2] The search warrant to search 2331 Girtha Lane was obtained first, on October 28, 2025, (Dkt. 38-2 at 1), while the search warrant for 2037 Commonwealth Drive was obtained on October 31, 2025, (Dkt. 38-1 at 1).

### B. Procedural History

Martinez was indicted on two counts of possession of a firearm by a prohibited person and possession of ammunition by a prohibited person on February 11, 2026. (Dkt. 1.) Defendant filed this motion to suppress on June 30, 2026. (Dkt. 38.) The government responded, (Dkt. 48), and Defendant replied, (Dkt. 51). The court held a hearing on the motion to suppress on August 11, 2026. (Dkt. 52.)

## II. Standard of Review

The Fourth Amendment prohibits the issuance of warrants, unless a warrant is based "upon probable cause" and unless it "particularly describ[es] the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. In other words, the Fourth Amendment requires that a warrant (1) be supported by probable cause; (2) particularly describe the place to be searched and the things to be seized; and (3) be issued by a neutral, disinterested magistrate. *Dalia v. United States*, 441 U.S. 238, 255 (1979). If a warrant is invalid, the proper remedy in a criminal action is "ordinarily" to suppress the evidence derived from it. *United States v. Thomas*, 908 F.3d 68, 72 (4th Cir. 2018).

Probable cause is "not a high bar." *United States v. Orozco*, 41 F.4th 403, 408 (4th Cir. 2022). "Whether probable cause for a search exists is a 'practical, common-sense' question, asking whether 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Blakeney*, 949 F.3d 851, 859 (4th Cir. 2020) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). In determining whether probable cause exists, magistrates may draw "reasonable, commonsense inferences" based on "the totality of the

circumstances." *United States v. Richardson*, 607 F.3d 357, 371 (4th Cir. 2010). Magistrates should not assess "each fact in isolation," *see D.C. v. Wesby*, 583 U.S. 48, 60 (2018), or apply "a precise legal formula or test," *United States v. Myers*, 986 F.3d 453, 456 (4th Cir. 2021) (cleaned up). In other words, the touchstone of probable cause is common sense.

Generally, evidence seized in violation of the Fourth Amendment is subject to suppression under the exclusionary rule, the overarching purpose of which is "to deter future unlawful police conduct." *United States v. Calandra,* 414 U.S. 338, 347–48 (1974). But the deterrence objective "is not achieved through the suppression of evidence obtained by 'an officer acting with objective good faith' within the scope of a search warrant issued by a magistrate." *United States v. Perez*, 393 F.3d 457, 461 (4th Cir. 2004) (quoting *United States v. Leon*, 468 U.S. 897, 920 (1984)). For this reason, in *Leon*, "the Supreme Court recognized a good faith exception to [the exclusionary] rule, under which evidence obtained by an officer who acts in objectively reasonable reliance on a search warrant will not be suppressed, even if the warrant is later deemed invalid." *Thomas*, 908 F.3d at 72 (citing *Leon*, 468 U.S. at 922). "As a general rule, when a neutral magistrate has issued a warrant, the issuance 'suffices to establish' that a law enforcement officer has 'acted in good faith in conducting the search.'" *United States v. Skinner*, No. 3:19-cr-00019, 2021 WL 1725543, at *20 (E.D. Va. Apr. 29, 2021) (quoting *Leon*, 468 U.S. at 922).

Courts have recognized four scenarios in which the good-faith exception will not apply: (1) when the magistrate is misled by information in a search warrant affidavit that the agent knew was false or would have known was false but for the agent's reckless disregard for the

truth; (2) when the magistrate "wholly abandoned his judicial role"; (3) when the affidavit is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; and (4) when the warrant is "so facially deficient—*i.e.*, in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid." *United States v. Doyle*, 650 F.3d 460, 467 (4th Cir. 2011) (cleaned up).

## III. Analysis

Martinez seeks to suppress the evidence seized during the November 4, 2025 searches of 2037 Commonwealth Drive and 2331 Girtha Lane in Charlottesville, Virginia, as well as all fruits of the search, including firearms, ammunition, cell phones and related cellphone data. For the following reasons, the court will deny the motion.

### A. Martinez has standing to contest the search of 2037 Commonwealth Drive.

To start, the court examines whether Martinez has standing to challenge the search of 2037 Commonwealth Drive, which was the residence of his ostensible romantic partner, Miyanna Harris. Fourth Amendment rights are personal and "do not extend to every person present during a search." *United States v. Howard*, 530 F. Supp. 3d 611, 616 (W.D. Va. 2021) (citing *United States v. Bullard*, 645 F.3d 237, 242 (4th Cir. 2011)). The mere fact that the government seeks to introduce evidence against a defendant does not, by itself, convey standing to challenge the search that uncovered that evidence. *United States v. Gray*, 491 F.3d 138, 144 (4th Cir. 2007). Instead, a defendant must show he had a "legitimate expectation of privacy" in the place searched to have standing to suppress evidence found therein. *United*

*States v. Castellanos*, 716 F.3d 828, 833–34 (4th Cir. 2013), *cert. denied*, 571 U.S. 1113 (2013). An individual "may have a legitimate expectation of privacy in the house of someone else," *Minnesota v. Carter*, 525 U.S. 83, 89 (1998), including when they are "an overnight guest," *Minnesota v. Olson*, 495 U.S. 91, 98 (1990), or a social guest, *Bonner v. Anderson*, 81 F.3d 472, 475 (4th Cir. 1996).

Here, the parties—and the court—agree that Martinez has standing. The United States "does not challenge the defendant's standing to assert some privacy interests as to 2037 Commonwealth Drive generally," given that Martinez stayed at Harris's residence as an overnight guest. (Gov.'s Resp. at 14 n.2 (emphasis omitted).) Martinez also asserts that he was a social guest at 2037 Commonwealth Drive and stayed overnight on the day the search was executed. (Def.'s Reply at 4 (Dkt. 51).) For these reasons, Martinez had a legitimate expectation of privacy in 2037 Commonwealth Drive that gives him standing to contest the search of its premises.

**B. There is a sufficient nexus between Martinez's suspected firearm possession and 2037 Commonwealth Drive.**

In his first challenge, Martinez contends that the affidavit for the search of 2037 Commonwealth Drive did not establish a nexus between his suspected firearm possession and that location. The court holds otherwise. The affidavit made out probable cause that evidence of Martinez's alleged firearm possession would be found at 2037 Commonwealth Drive. And even if it did not, the *Leon* good-faith exception would apply.

1. <u>The search warrant and affidavit sufficiently established a nexus between Martinez's suspected firearm and 2037 Commonwealth Drive.</u>

"The evaluation of whether a search warrant is supported by probable cause turns first on whether the items to be seized are evidence of criminal activity, and second, on whether it is reasonable to believe that the items to be seized will be found in the place to be searched." *United States v. Wienke*, 733 F. App'x 65, 69 (4th Cir. 2018) (unpublished per curiam decision) (cleaned up). The latter requirement is met by showing a "nexus between the place to be searched and the items to be seized." *Id.* (quoting *United States v. Anderson*, 851 F.2d 727, 729 (4th Cir. 1988)). Whether a nexus exists "turns on 'the nature of the item and the *normal inferences* of where one would likely keep such evidence.'" *Id.* (quoting *Anderson*, 851 F.2d at 729) (emphasis in original).

Here, the magistrate could reasonably conclude that Martinez stored alleged firearms at Harris's residence. To start, the affidavit's facts—including A.P.'s identification of Martinez as a shooter and the fact that his Nissan Maxima was found amidst fourteen spent shell casings where the shooting happened—suggested that Martinez possessed a gun and ammunition just a few days before the date of the affidavit. Next, the affidavit's facts supported a reasonable inference that Martinez stayed overnight or resided at 2037 Commonwealth Drive soon after the shooting. The affidavit suggested that Martinez was in a romantic relationship with Harris at that time. (2037 Commonwealth Dr. Aff. ¶ 11 (noting that the two were seen embracing in a gas station parking lot).) The affidavit also noted that on October 29, 2025, around 10:00 p.m., both cars registered to Harris and Martinez were parked in front of 2037 Commonwealth Drive, where the first-floor lights were on. (*Id.* ¶ 13.) Later that night—with

both cars still parked outside—the lights in the home had been turned off. (*Id.* ¶ 15.) Further, law enforcement did not see any lights on inside Martinez's registered home address, any vehicles parked there, or signs of occupancy on that night or the nights of October 27 and 28, 2025. (*Id.* ¶¶ 9, 12.)

This evidence—combined with Detective Holmes's training and experience that individuals "possess firearms on their person, in their residences and *places they frequent*," (*id.* ¶ 17 (emphasis added))—allowed the magistrate to draw "the normal inference[]" that Martinez would be "likely [to] keep" a potential firearm at 2037 Commonwealth Drive, *Anderson*, 851 F.2d at 729. The Fourth Circuit has consistently "upheld warrants to search suspects' residences and even temporary abodes." *United States v. Williams,* 548 F.3d 311, 319 (4th Cir. 2008). And even if 2037 Commonwealth Drive was not Martinez's primary residence, as Martinez contends, the search was not invalid "merely because he splits his time among several different homes."[3] *United States v. Grossman*, 400 F.3d 212, 218 (4th Cir. 2005).

For these reasons, the search warrant affidavit established a sufficient nexus between Martinez's suspected firearm and 2037 Commonwealth Drive.

[3] Moreover, Martinez's argument that he has no nexus with 2037 Commonwealth Drive is in tension with his position that he has standing to challenge its search. In his briefing, Defendant alleges that "even the minimal facts outlined in the search warrant affidavit . . . demonstrate that Mr. Martinez was a social guest at 2037 Commonwealth Drive with a reasonable expectation of privacy in the premises." (Def.'s Reply at 3.) Overnight guests have a reasonable expectation of privacy in their host's home "precisely because it provides him with privacy, a place where he and *his possessions* will not be disturbed by anyone but his host and those his host allows inside." *Olson*, 495 U.S. at 98 (emphasis added). In other words, the fact that Martinez has a close enough relationship with 2037 Commonwealth Drive to have standing to challenge its search only bolsters the existence of an adequate nexus. The converse is also true. If Martinez was only a transient visitor of 2037 Commonwealth Drive, it is unclear how he has standing to challenge its search. *Gray*, 491 F.3d at 144 (noting "a temporary visitor to a residence . . . cannot generally claim the Fourth Amendment's protections.").

2. The good-faith exception would apply to the search of 2037 Commonwealth Drive.

Regardless of whether the warrant established a nexus between Martinez and 2037 Commonwealth Drive, the *Leon* good-faith exception would apply. The Supreme Court has instructed that searches conducted "pursuant to a warrant will rarely require any deep inquiry into reasonableness, for a warrant issued by a magistrate normally suffices to establish that a law enforcement officer has acted in good faith in conducting the search." *Leon*, 468 U.S. at 922 (cleaned up). Only when one of the four *Leon* exceptions applies can a court find that an officer failed to act in good faith.

Defendant argues that the good-faith exception does not apply because "the affidavit is so lacking in indicia of probable cause [that] official belief in its existence is entirely unreasonable." (Def.'s Mot. to Suppress at 20.) Specifically, Defendant argues that "the sole premise for the nexus is associational—[that] Mr. Martinez was merely associated with the occupant of the residence." (*Id.* at 21.) But as discussed above, this is not the case. The affidavit supported a reasonable inference that Martinez stayed overnight, just a few days after the October 24 shooting, at 2037 Commonwealth Drive. (*See* 2037 Commonwealth Dr. Aff. ¶¶ 9, 11–15.) Detective Holmes's training and experience suggested that Martinez might keep a firearm at 2037 Commonwealth Drive in those circumstances. (*Id.* ¶ 17.) And the affidavit—besides listing A.P.'s identification of Martinez—noted that Martinez's Nissan Maxima was located in the middle of spent casings, with an empty duffel bag on its hood and a freshly-broken window, apparently from bullets. (*Id.* ¶¶ 1, 3.) The affidavit also noted that a witness saw a black male "ducking behind" that Nissan Maxima and shooting at someone, and that

Detective Holmes knew Martinez to be a black male. (*Id.* ¶¶ 2, 6.) For these reasons, official belief in the existence of probable cause that Martinez possessed a gun and that he would store it at 2037 Commonwealth Drive was not "entirely unreasonable." *Doyle*, 650 F.3d at 467.

**C. The court need not determine whether the warrant established probable cause to search and seize Martinez's phone, as the good-faith exception applies.**

Next, Martinez argues that search warrants were overbroad in authorizing the search of all "mobile communication devices and their contents related to the offense" at 2037 Commonwealth Drive and 2331 Girtha Lane. (Def.'s Mot. to Suppress at 15–19.) A warrant is overbroad if it is "broader than the probable cause on which it is based." *See United States v. Lyles*, No. CR TDC-17-0039, 2017 WL 5633093, at *4 (D. Md. Nov. 20, 2017), *aff'd*, 910 F.3d 787 (4th Cir. 2018) (quoting *United States v. Hurwitz*, 459 F.3d 463, 473 (4th Cir. 2006)); *United States v. Bolling*, No. 2:21-cr-00087, 2023 WL 5616188, at *6 (S.D.W. Va. Aug. 30, 2023) ("Warrants must not authorize a search or seizure greater in scope than existing probable cause can sustain; otherwise, they are overbroad."), *aff'd*, No. 23-4572, 2025 WL 1682298 (4th Cir. June 16, 2025).

1. <u>Martinez lacks standing to challenge the search and seizure of Miyanna Harris's phone.</u>

Martinez challenges the search and seizure of both his and Harris's cell phones. However, Martinez lacks standing to do so regarding Harris's phone. The thrust of an overbreadth challenge is that a warrant failed to establish probable cause as to items to be seized or locations to be searched. *Bolling*, 2023 WL 5616188, at *6. In other words, by making an overbreadth challenge as to Harris's phone, Martinez contends that Harris's phone was

seized without probable cause in violation of the Fourth Amendment. But Martinez "may not assert a third party's Fourth Amendment rights." *United States v. Williamson*, 85 F. App'x 943, 944 (4th Cir. 2004) (unpublished per curiam decision); *see also United States v. Alexander*, No. 3:22-cr-00036, 2023 WL 1456286, at *3 (W.D.N.C. Feb. 1, 2023) ("Defendant lacks standing to raise a claim that the search of a cell phone that does not belong to him violates his Fourth Amendment rights."). For this reason, the court only considers whether the warrant was overbroad as to Martinez's cell phone.

2. <u>The good-faith exception applies to the search of Martinez's cell phone.</u>

Defendant argues that law enforcement lacked probable cause to search Martinez's cell phone. Martinez alleges that there was "no individualized nexus between the charged offense" and Martinez's cell phone, as nothing in the affidavits "suggest[ed] a link between cell phone evidence and the alleged possessory firearm offense." (Def.'s Mot. to Suppress at 17–18.) Specifically, Martinez objects that the "warrants have no specific information as to why in this case Detective Holmes expected to find evidence of the offense on any cell phone beyond his 'training and experience.'" (*Id.* at 18.)

Martinez's objection highlights important interests. The Fourth Circuit has rejected the notion that "the ubiquity of cell phones, standing alone, can justify a sweeping search for such a device." *United States v. Sueiro*, 59 F.4th 132, 141 (4th Cir. 2023) (cleaned up). And "[t]he Supreme Court has recognized that 'cell phones, as a category, implicate privacy concerns far beyond those implicated by the search of a cigarette pack, a wallet, or a purse.'" *United States v. Lyles*, 910 F.3d 787, 795 (4th Cir. 2018). Other courts have also expressed

concern with the government "fall[ing] back on 'training and experience' to cash their blank check for automatic phone searches." *In re Search of One Device & Two Individuals Under Rule 41*, 783 F. Supp. 3d 183, 190 (D.D.C. 2025).

Ultimately, however, the court need not rule on whether the search of Martinez's cell phone was supported by probable cause, as *Leon*'s good-faith exception applies here. *See Leon*, 468 U.S. at 924–25 (noting that courts may begin with good faith analysis before determining the existence of probable cause). First, the warrants were not so lacking in indicia of probable cause as to render reliance on the warrant "entirely unreasonable." *United States v. Seerden*, 916 F.3d 360, 367–68 (4th Cir. 2019), *as amended* (Feb. 21, 2019). As the court discussed above, the 2037 Commonwealth Drive affidavit included facts suggesting that Martinez possessed a gun and ammunition on October 24, 2025. (*See supra* Section III.B.1.) The affidavit also allowed for the reasonable inference that Martinez possessed his cell phone at or near the time of the shooting. (*See* 2037 Commonwealth Dr. Aff. ¶¶ 7–8 (noting that authorities reached Martinez at the relevant telephone number before and shortly after the shooting).) The warrants were sworn out—and the search was executed—only a few days after Detective Holmes confirmed that Martinez possessed the targeted phone. (Dkt. 38-1 at 2; Dkt. 38-2 at 2.) Detective Holmes also described how twenty-one years of experience with "numerous shooting cases" has shown him that evidence of firearm possession is often found on an individual's cell phone. (2037 Commonwealth Dr. Aff. ¶¶ 27–42; *see id.* ¶ 35 ("Photos and videos depicting individuals in possession of and discharging firearms are common in the experience of Detective Holmes."); *id.* ¶ 36 ("Searches for firearm parts and accessories tend

to provide evidence of possession of such firearms."); 2331 Girtha Ln. Aff. ¶¶ 10–25 (same).) Finally, Detective Holmes noted that his training and experience revealed to him that "most individuals own and possess a cellular telephone" and "maintain possession of their phones on their person, particularly when they travel or move about during their daily travels." (2037 Commonwealth Dr. Aff. ¶ 32; 2331 Girtha Ln. Aff. ¶ 15.) While Detective Holmes could have provided additional information about his training and experience that led him to this conclusion, these are far from "wholly conclusory statements, which lack[ed] the facts and circumstances from which a magistrate can independently determine probable cause." *Doyle*, 650 F.3d at 470 n.12 (cleaned up).[4]

Additionally, the magistrate did not "abandon[] his judicial role" in granting the search warrant, such as by acting as a rubber stamp to conclusory affidavits. *Doyle*, 650 F.3d at 467 (quoting *United States v. DeQuasie*, 373 F.3d 509, 519 (4th Cir. 2004)).[5] After all, the magistrate who approved the warrant for 2331 Girtha Lane did not permit Detective Holmes to search for evidence of Martinez's dominion and control over 2331 Girtha Lane. (Holmes Decl. ¶¶ 3(b), (d) (Dkt. 48-1).) Detective Holmes therefore had an objectively reasonable basis "to

[4] Indeed, other courts have found probable cause in similar circumstances. *United States v. Ivey*, 91 F.4th 915, 917–18 (8th Cir. 2024) (noting that because an affiant's training and experience indicated that "offenders often use social media to talk about their crimes and to post images of their activities[,] . . . . [t]here was a fair probability that evidence connecting [defendant] to a firearms offense would be present in his phone").

[5] In arguing against application of the good faith exception, Martinez only argues that the second and third *Leon* exceptions apply, (Def.'s Mot. to Suppress at 19–21): that is, that the magistrate "wholly abandoned his judicial role" by acting as a rubber stamp, and that the affidavit was so "lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Doyle*, 650 F.3d at 467 (cleaned up). Martinez did not argue—and the court does not find—that the first and fourth *Leon* exceptions apply: *i.e.*, that (1) the magistrate was misled by information in a search warrant affidavit that the agent knew was false or would have known was false but for the agent's reckless disregard for the truth, or that the warrant was "so facially deficient—*i.e.*, in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid." *Id.* (cleaned up).

believe the magistrate had made a careful and thorough determination and would have denied the warrants or any portion thereof if lacking probable cause." (Gov't's Resp. at 21.)

Finally, the court determines "that suppression would have no deterrent value here." *United States v. Monjaraz*, No. 5:22-cr-00002, 2022 WL 17182069, at *15 (W.D. Va. Nov. 23, 2022). The Supreme Court has stated that the "answer to the question of what police must do before searching a cell phone . . . is accordingly simple—get a warrant." *Riley v. California*, 573 U.S. 373, 403 (2014). But "[t]hat is exactly what officers did here." *Monjaraz*, 2022 WL 17182069, at *15. Martinez has not shown that officers failed to act in good faith reliance on the signed warrant.

**D. Martinez has not made a substantial preliminary showing that he is entitled to a *Franks* hearing.**

Defendant argues that he is entitled to a *Franks* hearing because the search warrant affidavits contained false statements and omitted relevant information. "An accused is generally not entitled to challenge the veracity of a facially valid search warrant affidavit." *United States v. Allen*, 631 F.3d 164, 171 (4th Cir. 2011). A *Franks* hearing allows a criminal defendant a "narrow way" to challenge an affidavit's validity. *United States v. Moody*, 931 F.3d 366, 370 (4th Cir. 2019). Given the "presumption of validity with respect to the affidavit supporting the search warrant," *Franks v. Delaware*, 438 U.S. 154, 171 (1978), showing an entitlement to a *Franks* hearing is a "heavy" burden, *United States v. Tate*, 524 F.3d 449, 454 (4th Cir. 2008). To obtain a *Franks* hearing, a defendant must make a "substantial preliminary showing" that (1) law enforcement made "a false statement" in the affidavit in support of a warrant; (2) the false statement was made "knowingly and intentionally, or with reckless

disregard for the truth"; and (3) the false statement was material, or "necessary to the finding of probable cause." *United States v. White*, 850 F.3d 667, 673 (4th Cir. 2017) (quoting *Franks*, 438 U.S. at 155–56).

Regarding the first prong, the falsity of a statement "cannot rely on a purely subjective disagreement with how the affidavit characterizes the facts"; instead, there "must be evidence showing that the statements at issue are objectively false." *Moody*, 931 F.3d at 370. On the second prong, "the defendant must provide facts—not mere conclusory allegations—indicating that the officer subjectively acted with intent to mislead, or with reckless disregard for whether the statements would mislead, the magistrate." *Id.* at 371. "[R]eckless disregard in the *Franks* context requires a showing that the affiant personally recognized the risk of making the affidavit misleading." *United States v. Pulley*, 987 F.3d 370, 377 (4th Cir. 2021). Finally, to assess materiality, a court must correct the affidavit by either excising the misrepresentation or "insert[ing] the facts recklessly [or intentionally] omitted," and then "determin[ing] whether or not the corrected warrant affidavit would establish probable cause." *United States v. Wharton*, 840 F.3d 163, 169 (4th Cir. 2016).

The *Franks* test applies to cases "in which an agent includes affirmatively false statements in a warrant affidavit, [and] also when an agent omits relevant facts from the affidavit." *United States v. Lull*, 824 F.3d 109, 114 (4th Cir. 2016) (citing *United States v. Colkley*, 899 F.2d 297, 300 (4th Cir. 1990)). But "[w]hen a defendant relies on an omission, this heavy burden is even harder to meet." *United States v. Haas*, 986 F.3d 467, 474 (4th Cir. 2021). "In that situation," a defendant must still show that "law enforcement made the omission

'knowingly and intentionally, or with reckless disregard for the truth'" and that "inclusion of the omitted evidence in the affidavit would have defeated its probable cause." *Id.* (quoting *Colkley*, 899 F.2d at 301). "In determining whether the affidavit with the omitted information would be supported by probable cause, [courts] must apply the 'totality of the circumstances' test of *Illinois v. Gates*." *Colkley*, 899 F.2d at 301 (citing 462 U.S. 213 (1983)) (cleaned up).

Here, Martinez argues that Detective Holmes included both an affirmative false statement and multiple omissions in his search warrant affidavits. The court addresses each in turn.

1. <u>Martinez fails to show that Detective Holmes made an intentionally false statement.</u>

First, Martinez contends that Detective Holmes included a false statement in the 2037 Commonwealth Drive affidavit: that Detective Holmes "knows from experience that Peewee Carmelo Martinez and other individuals take their firearms with them when they leave their residences or places that they stay and carry them on their person." (Def.'s Mot. to Suppress at 21; 2037 Commonwealth Dr. Aff. ¶ 18.) Even assuming (without deciding) that Martinez met the "first required showing" of establishing the "falsity" of Detective Holmes' statement, Martinez fails at the second prong: showing that Detective Holmes made the statement with "*intentional* falsity or *reckless* disregard for the truth." *Moody*, 931 F.3d at 370–71 (emphases added). On this second prong, "[a]n innocent or even negligent mistake by the officer will not suffice." *Id.* at 371. Instead, an officer must have "subjectively acted with intent to mislead" in including the false statement in the affidavit. *Id.*

Martinez's only evidence for this is an assertion that "Detective Holmes clearly knew about [a] specific incident where Mr. Martinez did *not* carry a firearm after leaving his home." (Def.'s Mot. to Suppress at 23.) "[B]ecause [this incident] directly contradicts the representation of Detective Holmes' own 'experience' with Mr. Martinez as alleged in the affidavit," Martinez alleges, "there can be no other conclusion than that he either intentionally made this false statement or that he made it with reckless disregard for the truth." (*Id.* at 23–24.) But this falls far short of the requisite "*facts*—not mere conclusory allegations—indicating that the officer *subjectively* acted with intent to mislead, or with reckless disregard for whether the statements would mislead, the magistrate." *Moody*, 931 F.3d at 371.

Even if Martinez had shown that Detective Holmes made an intentionally false statement, it would not be material. Even after excising this statement, the affidavit establishes probable cause to search 2037 Commonwealth Drive by stating that Martinez was involved in the shooting at an apartment complex also on Commonwealth Drive just a few days before the search, (Dkt. 38-1 ¶ 1; Dkt. 38-2 ¶ 2); that Martinez's Nissan Maxima was located in the middle of spent casings, with an empty duffel bag on its hood and a freshly-broken window, apparently from bullets, (Dkt. 38-1 ¶¶ 1, 3; Dkt. 38-2 ¶¶ 1, 3); and including facts suggesting that he was staying with his romantic partner at 2037 Commonwealth Drive, given that his car was seen in front of it overnight, (Dkt. 38-1 ¶¶ 9, 11–15). The affidavit also "explain[ed] that individuals may possess firearms on their person, in their residence, places they frequent, and their vehicles, and that it is common to find other firearms accessories or evidence of firearm possession in those same locations." (Gov't's Resp. at 24.) For these reasons, Martinez has

failed to meet his "heavy" burden of showing an entitlement to a *Franks* hearing. *Tate*, 524 F.3d at 454.

2. Martinez has not made a substantial preliminary showing that any omitted information warrants a *Franks* hearing.

Next, Martinez argues that Detective Holmes intentionally or recklessly omitted several pieces of information from the warrant affidavits. The court addresses Martinez's arguments in turn.

First, Martinez argues that the warrant affidavits omitted that: (1) "A.P. was only ten years old"; (2) "A.P. gave conflicting statements, including her initial statements she did not see or could not identify the shooter"; (3) "A.P. was present with her mother, Corneesha Cowan, who had a self-proclaimed hatred of Mr. Martinez, and who had also previously denied seeing or knowing the shooters"; (4) "Other witnesses on the scene described the shooter in the position alleged by the police to be Mr. Martinez's as a dark-skinned male, a description that does not match Mr. Martinez's description"; and (5) "A.P. made this statement only after her cousin was detained by police on the scene for matching the descriptions given of the shooter by other witnesses and after her mother gave her a nod, a smile, and mouthed the words 'baby daddy' before she identified Mr. Martinez as the shooter." (Def.'s Mot. to Suppress at 21–22.) Martinez contends that these omissions entitle him to a *Franks* hearing.

But Martinez has not met his "heavy burden" to show these omissions were made "knowingly and intentionally, or with reckless disregard for the truth." *Haas*, 986 F.3d at 474. According to the government's evidence, Detective Holmes did not know any of this omitted information when he drafted the affidavits. (Gov't's Resp. at 24–25.) Detective Holmes did

not go to the scene of the shooting, and he only learned about the incident from Detective Nicholas Richardson (the lead investigator) and from reports he read from other officers, including Officer Legg. (*Id.*; Holmes Decl. ¶¶ 2–4.)

Martinez has two responses. First, Martinez argues that "[w]hether Detective Holmes had personal knowledge of the material omissions . . . is best suited to be resolved at a *Franks* hearing given that Holmes concedes that he omitted the fact th[at] A.P. was a minor from his affidavit." (Def.'s Reply at 24.) But this flips the burden for obtaining a *Franks* hearing on its head. Martinez is the one who must make a "*substantial preliminary showing* that . . . law enforcement made an omission . . . knowingly and intentionally, or with reckless disregard for the truth" to obtain a *Franks* hearing. *Haas*, 986 F.3d at 474 (emphasis added) (cleaned up). Martinez has offered no evidence or argument countering the government's assertion that Detective Holmes lacked any personal knowledge as to the above-referenced omissions. Because "[a]n officer who does not personally know information cannot intentionally or recklessly omit it," *Pulley*, 987 F.3d at 379, Martinez has failed to make a substantial preliminary showing that Detective Holmes omitted this evidence with the requisite intent or recklessness.[6]

Second, Martinez argues that even if Detective Holmes did not know of the omitted information, omissions by a *non-affiant* government agent can still give rise to a *Franks* hearing. (Def.'s Reply at 26–27.) While it is true that several circuits have applied such a rule, (*id.* at 26 (collecting cases)), the Fourth Circuit has not done so—and has seemed to indicate the

---

[6] For the same reason, Martinez is not entitled to a *Franks* hearing simply because Detective Holmes omitted allegedly inconsistent eyewitness testimony from a witness named Jeff Giron. (Def.'s Mot. to Suppress at 22 n.5.) Defendant offers no explanation for how Detective Holmes would have known this information.

opposite. *Pulley*, 987 F.3d at 379 ("The *Franks* inquiry is designed to identify intentionality or reckless disregard on the part of the affiant."). But even the out-of-circuit precedent would require Martinez to show "some showing of intentionality [or recklessness] by the non-affiant to warrant a *Franks* hearing." *United States v. Lucas*, 379 F. Supp. 3d 182, 194 (W.D.N.Y. 2019) (cleaned up); *see also id.* (noting that a "mere failure of a [non-affiant officer] to convey information to an affiant, without any evidence that [] the failure was undertaken with the intent to deceive, is insufficient to warrant a hearing under *Franks*"). Martinez has not made this substantial preliminary showing. Nothing in Martinez's argument or proffered evidence suggests that a non-affiant officer omitted information to Detective Holmes with the requisite intent or recklessness to warrant a *Franks* hearing.

Martinez makes a fallback argument. As the government notes, Detective Holmes was personally aware that A.P. was a "juvenile." (Gov't's Resp. at 28; Holmes Decl. ¶ 4(a).) At the August 11 motion hearing, Martinez contended that Detective Holmes's omission of this fact should also warrant a *Franks* hearing. But Martinez has made no showing that Detective Holmes "subjectively knew that his failure to include [A.P.'s status as a juvenile] in the warrant affidavits would mislead the magistrate." *Haas*, 986 F.3d at 477. "[I]ndeed, the record itself points to the opposite conclusion." *Id.* In his declaration, Detective Holmes states that he knew A.P. was a relative of one of the parties involved in the police's previous visit to the Commonwealth Drive apartments. (Holmes Decl. ¶ 2(c).) According to Detective Holmes, this meant to him that A.P. "personally knew Peewee Martinez and would reasonably be able

to identify him." (*Id.*) This is a far cry from the type of subjective intent to mislead required for an omission to merit a *Franks* hearing.

Even if Detective Holmes intentionally or recklessly omitted A.P.'s status as a juvenile, this omission would not be material. Even adding A.P.'s status as a juvenile back into the affidavits,[7] "the corrected warrant affidavit[s] would establish probable cause." *Wharton*, 840 F.3d at 169. Again, "[i]n determining whether the affidavit with the omitted information would be supported by probable cause, [courts] must apply the 'totality of the circumstances' test of *Illinois v. Gates*." *Colkley*, 899 F.2d at 301. Because the affidavits stated that A.P. personally knew Martinez and witnessed him firing a weapon, (2037 Commonwealth Dr. Aff. ¶ 3; 2331 Girtha Ln. Aff. ¶ 3), even A.P.'s status as a juvenile would not foreclose a magistrate from drawing the "practical, commonsense" conclusion, based on reasonable inferences drawn from everything that was presented to the magistrate, that Martinez was involved in the shooting and that he may have possessed a firearm. *Colkley*, 899 F.2d at 302 (cleaned up).

---

[7] The parties contest the proper standard for assessing the materiality of A.P.'s status as a juvenile. Defendant, citing *Lull*, asserts that the proper way to assess materiality would be to excise all of A.P.'s statements from the affidavit. (Def.'s Mot. to Suppress at 30.) The court declines to apply that materiality standard here. While *Lull* did assess materiality by excluding all of a confidential informant's statements from an affidavit, the court noted that *Lull* did so based on a determination "that the informant's *demonstrated unreliability* undermined his credibility and the veracity of his statements presented in the warrant application." *Lull*, 824 F.3d at 118 (emphasis added). The court sees no need to apply that standard here, given *Lull*'s unique circumstances involving a confidential informant who stole from law enforcement and was deemed "absolutely" unreliable. *See id.* at 112, 116. The court finds no egregious or "absolute" unreliability here, merely based on A.P.'s status as a juvenile. *Cf. Burns v. Clarke*, No. 1:17-cv-00683, 2018 WL 3999710, at *13 (E.D. Va. Aug. 20, 2018) ("Under federal law, children are presumed competent to testify . . . .").

## IV. Conclusion

For these reasons, the court will deny the motion to suppress and will deny Martinez's request for a *Franks* hearing. (Dkt. 38.)

An appropriate Order will issue.

**ENTERED** this 24th day of August, 2026.

HON. JASMINE H. YOON
UNITED STATES DISTRICT JUDGE